Filed 12/4/23  P. v. Pearson CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DAYVONE DUANE PEARSON,<br><br>  Defendant and Appellant. | F082052<br><br>(Super. Ct. No. BF172410A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Appellant Dayvone Duane Pearson was convicted by jury of one count of inflicting pain and suffering on a child under circumstances or conditions likely to produce great bodily harm or death, G.W. (Pen.[1] Code § 273a, subd. (a)). The jury further found true an enhancement alleging that Pearson had personally inflicted great bodily injury in the commission of the offense (§ 12022.7, subd. (d)). He was sentenced to a term of 10 years in state prison.

Pearson raises the following claims on appeal: (1) the trial court erred in denying his motion to suppress inculpatory statements made by Pearson during police interrogation. Pearson contends that his statements were induced by an implied promise of leniency if he confessed; (2) the trial court abused its discretion by excluding statements made by Mariah W., Pearson's codefendant, to a Child Protective Services caseworker, wherein Mariah admitted she had lied about Pearson abusing G.W.; (3) trial counsel was constitutionally ineffective for failing to object to the admission of Mariah's statements to three witnesses (Pearson contends this evidence was inadmissible hearsay); (4) there was insufficient evidence to warrant a jury instruction on flight (CALCRIM No. 372); (5) the cumulative effect of these errors necessitates reversal of his conviction; and (6) recent amendments to section 1170, subdivision (b) necessitates remand of the matter for a new sentencing hearing.

In light of recent amendments to section 1170, subdivision (b), we will remand the matter back to the lower court for resentencing. We otherwise affirm the judgment of conviction.

---

[1] All further undefined statutory citations are to the Penal Code unless otherwise indicated.

## PROCEDURAL HISTORY

On August 25, 2020, the Kern County District Attorney filed an amended consolidated information charging Pearson with inflicting pain and suffering on a child, G.W., under circumstances or conditions likely to produce great bodily harm or death (§ 273a, subd. (a)).  The information further alleged that Pearson had inflicted great bodily injury on the victim, G.W., who was under the age of five (§ 12022.7, subd. (d)).  The information also charged Mariah W. with inflicting pain and suffering on G.W., under circumstances likely to cause great bodily harm or death by failing to protect and/or provide medical care (§ 273a, subd. (a)).

On August 17, 2020, Pearson's and Mariah's jury trials commenced.  Two juries were empaneled, one for each defendant.

On October 20, 2020, Pearson was found guilty as charged.[2]  The jury further found true the great bodily injury enhancement allegation.

On November 18, 2020, the trial court sentenced Pearson to a prison term of 10 years, comprised of the mid-term sentence of four years on count 1, plus the upper term sentence of six years for the great bodily injury enhancement.

Pearson filed a timely notice of appeal.

## STATEMENT OF FACTS

*The Prosecution's Case*

On May 25, 2018, at approximately 7:50 p.m., Mariah W.[3] brought her nine-month-old son, G.W., into the Priority Urgent Care facility in Bakersfield.  G.W.'s face was covered in bruises which were immediately noticeable; he appeared to have been physically abused.

---

[2]  Mariah was also found guilty but she is not a party to this appeal.

[3]  We refer to Mariah by her first name throughout this opinion to protect the identity of the victim.  No disrespect is intended.

3.

A medical assistant called 911. Mariah appeared to be very anxious. Concerned that she would leave, staff immediately brought Mariah and G.W. into a treatment room.

G.W. had bruising over his eyes, on his face, ears, jaw, head, elbow, torso, on his right shoulder, and on his left leg. Based upon their coloration, the bruises were in different stages of healing, suggesting that the injuries had occurred at different times. G.W. also had minor lacerations on his torso.

G.W.'s eyes were partially swollen shut. He had dried blood and dark bruising in both of his inner ears, and discharge in his ear. G.W.'s face was covered with a crusting of blood and mucus.

G.W. also had cradle cap, a skin infection, and impetigo, a bacterial infection, around his nostrils. His clothes, body, and nails were dirty, and he had severe diaper rash near his groin.

G.W. had a large hematoma, or collection of blood under the skin, on the posterior left of his scalp. The treating physician's assistant was concerned that G.W. had suffered a fractured cranium or spinal injury, and recommended the baby be transported by ambulance to the hospital for a CT scan.

Mariah claimed that her parents had been watching G.W. for the past 10 days. Several hours after she picked G.W. up from their home, she noticed that G.W.'s face was covered in makeup. When Mariah removed it, she noticed that G.W.'s face was bruised.

Mariah walked in and out of the treatment room, leaving the baby unattended. When she returned to the lobby, she spoke to a Black man wearing a gray hoodie sweatshirt. The man, who police later determined was Pearson, did not accompany Mariah when she had initially walked into the urgent care facility.

Staff noticed that the man's hoodie was drawn over his head. They could not see the man's face because he was looking down when they walked into the lobby.

4.

When Bakersfield Police Officers Ryan Fujihara and Austin Kennedy arrived at the urgent care facility 10 minutes after the 911 call was placed, the man in the gray hoodie was gone. An hour and a half after Mariah and G.W. arrived at the urgent care facility, G.W. was transported by ambulance to Bakersfield Memorial Hospital for treatment.[4]

CT scans showed that G.W. had suffered several skull fractures, including a depressed skull fracture as well as a complex skull fracture. The fracture lines on the back of G.W.'s skull resembled a cracked egg which "spiderwebb[ed]" out. The injury was caused by one or possibly more than one impact. Due to the severity of his injuries, G.W. was subsequently transported to Valley Children's Hospital for a higher level of care.

The radiologist who examined G.W.'s scans opined that the skull fractures on the back of G.W.'s head could be consistent with someone backhanding a baby, resulting in the baby falling and hitting the back of their head on a tile floor. G.W.'s injuries could also have been caused by falling out of someone's arms, backwards, and landing on a cement floor, or by falling backwards from a bed or a couch onto a hard floor. The radiologist could not determine when G.W. had suffered the skull fracture.

*The Investigation*

### 1. Pearson and Mariah's Text Messages

Detectives interviewed Mariah while at Memorial Hospital and received her permission to examine her text messages to Pearson. Mariah and Pearson had been exchanging text messages throughout the evening. Investigating officers took pictures of

---

[4] The testimony was conflicting as to whether the ambulance or the police arrived first, and when they both arrived, but it is undisputed that Pearson was gone when the police arrived. Mariah purportedly told Pearson that they were going to take G.W., and that Pearson needed to leave.

Mariah's text messages, and later, they extracted Pearson's phone records. The following exchange represents a compilation of these records.

At 8:26 p.m., Mariah asked Pearson to " 'call [her] back.' "

At 8:50 p.m., Pearson texted, " 'Me and the homie are witness to picking u up and seeing him like that.' " Pearson asked Mariah whether everything was okay and asked her to call him back.

At 9:16 p.m., Pearson wrote, " 'Are u still talking to the cops still or did they go get him[?]' " Mariah did not respond. Four minutes later, Pearson asked Mariah to text him.

At 9:21 p.m., Mariah informed Pearson that she had bad news. Pearson texted Mariah inquiring what the news was, and asked Mariah, "So whats going on[?]"

At 9:31 p.m., Pearson asked, " 'Baby im scared and nervous whats going on[?]' " A few minutes later Pearson texted, " 'Is he alright[?]' "

At 9:35 p.m., Mariah informed Pearson that the baby had broken bones in his skull and he was going to be transferred to Valley Children's Hospital. Pearson replied, " 'We gone lock his ass up my best friend says if he tries to lie. Hell back u up to.' " He asked Mariah, " 'did they get your bro[?]' " Mariah told Pearson that the police did not believe her, they told her that she was lying, and that her family had also told the police that she was lying. Pearson responded, " 'Wtf but u should have said u have witnesses.' "

Between 12:04 a.m. and 1:17 a.m. on May 26th, just hours after G.W. was admitted into the hospital, the following exchange occurred between Pearson and Mariah:[5]

"[Pearson:] 'Right your brother needs to pay for what he did to him'

"[Mariah:] '[M]y all family is gonna tell the cops that you abuse the baby'

---

[5] To avoid frequent use of the word "*sic*," we quote the texts verbatim without acknowledging all spelling, typographical, and grammatical errors.

"[Pearson:] 'Are us serious well my best friend is going to tell them the truth when we picked u up to take u to ur friends house he had bruises on his face'

"[Mariah:] '[M]y whole family is gonna tell the cops that you abuse the baby'

"[Pearson:] 'I didn't do shit'

"[Mariah:] '[B]aby you should [tell] them that'

"[Pearson:] 'Should what'

"[Mariah:] '[T]ell the cops that you didn't abuse him'

"[Pearson:] 'Oh I am me and my best friend I just tryed to help u clean him up cause ur bro fkd him up'

"[Pearson:] 'And besides you wernt with me u stayed the night at a friends house'

"[Pearson:] 'You Know'

"[Mariah:] '[Y]es I know'

"[Pearson:] 'So they can't blame me at all'

[¶] … [¶]

"[Pearson:] ' … ur brother's going down'

"[Pearson:] 'Besides they can look at my daughter and see I don't beat or abuse kids'

"[Mariah:] 'that's true'

"[Pearson:] 'Yeah be real have u ever seen me beat my daughter or my nieces I would have been locked up along [clock emoji] ago.' "

### 2.     Mariah's Statements to Police

#### i.     *First Interview*

Bakersfield Police Department Officer Ryan Fujihara interviewed Mariah at Memorial Hospital on May 25, 2018. Although Mariah's statements were recorded and transcribed for the jury, her version of events is difficult to follow. We therefore summarize only those details pertinent to this appeal.

Mariah initially told Officer Fujihara that G.W. had been injured when she left the baby "[a]t [her] house," on Woodrow Avenue, while in her brother's care. She claimed that she had left G.W. with her brother, J.W., around 8:00 a.m. on Thursday, May 24, 2018. The baby was uninjured when she dropped him off. G.W. was injured when she picked him up around 12:00 p.m. that day.

Mariah then claimed G.W. was injured on Friday, May 25, 2018, between 11:00 a.m. and 1:00 p.m. when she dropped him off at the Woodrow Avenue home. When she picked up G.W., Pearson noticed that the baby had been covered in makeup. Mariah claimed that she observed the baby's injuries after she removed the makeup.

When deputies from the Kern County Sheriff's Department interviewed Mariah's family, Mariah's mother, D.H., told them that Mariah had been kicked out of the house on Wednesday, two days before Mariah took G.W. into urgent care. The baby was not injured when they left. Mariah's sister, C.W., told the deputies that the last time she saw Mariah and G.W., Mariah and G.W. left with Pearson. C.W. did not see any injuries on the baby the last time she saw him.

Deputies did not speak to Mariah's brother. J.W. had not been home that entire week.

#### ii.     *Second Interview*

On May 26, 2018, Mariah was interviewed by Bakersfield Police Officer Ryan Ryder. Senior Officer Guinn and Child Protective Services (CPS) caseworker, Susan

Rutledge, were present during the interview. Rutledge had a prior relationship with Mariah's family, as she had been assigned to them for some time.

Based on Mariah's initial statement, investigating officers could not determine where or how G.W.'s injuries occurred. Mariah's ensuing statements did virtually nothing to resolve the officers' confusion, leaving Officer Ryder with the impression that Mariah was lying. During her interview with Officer Ryder, she gave inconsistent and illogical answers as to where she and G.W. had been the past two days. Mariah maintained however that G.W. had been injured by her brother.

### iii. Third Interview

On Friday, May 25, 2018, just before midnight, Bakersfield Police Detective Peter Beagley and Sergeant John Bishop spoke to Mariah at Memorial Hospital. Mariah told them she had been staying at a friend's house, also on Woodrow Avenue, because she had been kicked out of her family's house for almost a week. That same week, she had also stayed at Pearson's house. During the time she and G.W. were at Pearson's house, G.W. had no injuries.

Mariah's ensuing statements, including the temporal proximity of events, changed at least twice during her interview, but she generally asserted that G.W.'s injuries occurred when she left the baby in J.W.'s care. Mariah claimed that J.W. babysat G.W. so that Mariah could help a friend move some items, and because J.W. wanted to babysit. So, on Thursday, she dropped G.W. off at her parent's house.

When Mariah picked G.W. up, she noticed that he had makeup on his face, including skin-colored foundation. Mariah questioned J.W. about it, but he just stared at her blankly. When she arrived at Pearson's house, she removed the makeup and noticed the baby's injuries.

9.

Detective Beagley confronted Mariah about her shifting version of events and stated that she was lying. Mariah changed her story again, and the following exchange occurred:

"MARIAH: Okay. Okay. I was at my boyfriend's, okay? And my boyfriend had [G.W.] 'cause I was in … the living room cleaning the house. My boyfriend had him. Okay? And then he called me outside. I saw [G.W.] on the ground, laying on the ground. And [Pearson] told me that he dropped him. I picked him up and … I looked at him.… I only saw this bruise, right here. But I didn't see this one.… [Pearson] said that he only did this when he dropped [G.W]. 'Cause [G.W.] was like hyper. Like he was hyper. Like he jumped. He told me …

"BEAGLEY: [G.W.] jumped out of [Pearson's] hands?

"MARIAH: Yeah that's how he fell. 'Cause [Pearson] … said that [G.W.] was excited.

"BEAGLEY: You understand that if [G.W.] jumps … he's not going to bruise both sides of his face like that? He has several skull fractures from somebody beating him.

"MARIAH: Well I don't know … he's beating him though when the person … that had him was my boyfriend. He had him outside. Playing with him. And then he tell me that he drop off at his hands and fell."

Mariah did not see the fall occur, but when she went outside, G.W. was laying on the ground with Pearson's shirt underneath him. Mariah claimed that G.W. was shivering and his body was "freezing cold," but he was clothed only in a diaper.

Pearson told Mariah that the baby had jumped out of his arms. This occurred sometime between 8:00 a.m. and 9:00 a.m. on Friday. Pearson explained that he had put the baby on a shirt on the ground to "get some oxygen." He told Mariah that he had removed the baby's clothes because "it was hot."

When Mariah picked G.W. up, she noticed that he had "bruises everywhere." Pearson gave multiple explanations for the baby's injuries. Mariah claimed that with the exception of a diaper rash, G.W. had no injuries on him when he woke up that morning.

10.

Detective Beagley asked Mariah whether she thought all of G.W.'s injuries could have come from one fall. She replied "[n]o." When asked what she thought happened to G.W., Mariah responded, "I think that [Pearson] beat him."

Mariah admitted that on Monday that same week, she had witnessed Pearson spank G.W. on his butt "really hard," for pulling another child's hair. The smack left a red mark. She denied observing Pearson hit the baby any other time.

Mariah admitted that she had blamed her brother for causing the baby's injuries because Pearson told her to. She agreed to do so because she was afraid Pearson would hit her, which he had done previously.

Detective Beagley suggested that Pearson injured G.W. out of frustration and asked Mariah whether the baby had been crying. Mariah responded affirmatively, explaining that the baby cries "all the time." Mariah stated that Pearson had hit G.W. on his arm, told him to " '[s]hut the fuck up,' " and cursed at him. Pearson also told Mariah that he had smacked G.W. because the baby would not stop crying.

The morning of May 25, 2018, Pearson told Mariah that G.W. jumped out of Pearson's arms and fell, resulting in the injuries to the baby's face. Mariah explained that when Pearson had smacked G.W. for crying, that occurred after the fall.

At some point that same day, Pearson's sister saw G.W.'s bruises over video chat and told Pearson and Mariah and G.W. to urgent care. Pearson did not want to go because of how G.W.'s face appeared.

Mariah admitted that she did not want to call 911 because CPS would become involved. She also claimed Pearson took her phone so that she would not call for an ambulance. When they finally walked to the urgent care facility at 4:00 p.m., Pearson told Mariah that if a doctor asked her what happened, she should blame other people for G.W.'s injuries.

11.

### iv. Mariah's Fourth Interview

After law enforcement visited the Woodrow Avenue home, Mariah's mother, D.H. called Rutledge. D.H. told Rutledge that Mariah had told her that Pearson caused G.W.'s injuries. Mariah told D.H. that Pearson struck the baby against the tile floor.

Based on this information, Detective Beagley re-interviewed Mariah. During this interview, Mariah admitted that Pearson had smacked G.W. on Monday. Mariah also confirmed, consistent with D.H.'s representations, that she had observed Pearson drag G.W. facedown on the tile floor of the living room in Pearson's home. Pearson was holding G.W. by his legs.

Mariah stated that Pearson was laughing while doing so and remarked that "it was funny to torture kids." Mariah claimed she tried to intervene but Pearson pushed her.

According to Mariah, Pearson hurt G.W. because the baby was crying. Although she wanted to leave Pearson, she was afraid of him.

### 3. Pearson's Interrogation

Pearson was handcuffed and escorted from his home to the Bakersfield Police Department on May 26, 2018, at 3:52 a.m., the morning after G.W. was taken into urgent care. Pearson was interrogated in the special victim's unit office by Sergeant Bishop and Detective Beagley for a little over an hour.

Although Pearson initially denied intentionally injuring G.W. and tried to blame Mariah's brother for causing the baby's injuries, he eventually admitted that he had accidentally dropped the baby, causing the baby to land on the ground face first.

After further questioning, Pearson admitted to backhanding G.W. twice out of frustration, causing the baby to fall backwards and hit his head "hard" against the tile floor. Although the detectives told Pearson that the baby had a fractured skull, they never told Pearson where the skull fractures were located. During the interrogation, Pearson

confirmed that he was responsible for some of the baby's bruises and "the fractured skull in the back."

*Testimony at Trial*

**1.    Testimony of J.K.**

J.K. fostered G.W. when he was discharged from the hospital. She eventually adopted.

When J.K. initially saw G.W., she stated that he was "dirty and filthy," and that his hair was matted. She had never seen a baby with a case of cradle cap so severe. J.K. learned that G.W. had never received immunizations and he appeared to be "very malnourished." G.W.'s diaper rash was so severe, it caused permanent scarring. And, as a result of his skull injury, G.W. had to wear a helmet to prevent further damage to his skull and aid in its proper healing.

J.K. described G.W. as being stuck in a perpetual state of flight or flight. She also described instances where G.W. exhibited aggressive behavior towards animals and other children, and stated that he had attachment issues.

Before it became clear that Mariah would not be able to get G.W. back, J.K. was supportive of reunification. Mariah and J.K. would communicate about G.W., the criminal case, and other topics.

In June 2018, a text message exchange occurred between J.K. and Mariah. Mariah stated that Pearson had hurt G.W. because "he was crying too much." Mariah also told J.K. that she had observed "[Pearson] dragging [G.W.] on the living room floor." These claims were consistent with prior statements Mariah made to J.K.

**2.    Testimony of D.H.**

Mariah's mother, D.H., testified that Mariah's cognitive limitations caused Mariah to lie frequently. D.H. also claimed that Mariah lied to get attention. She explained that Mariah had previously lied to CPS, accusing D.H. of abusing her. Mariah had also lied

13.

on two prior occasions to law enforcement, claiming that she had been raped by a boy named "Bottle."

Mariah began dating Pearson only a few weeks before G.W. was brought into urgent care. During that time, Mariah and G.W. were not living at one particular residence. Pearson was staying at his sister's house.

On May 24, 2018, the day before G.W. was injured, Mariah and G.W. visited the family home on Woodrow Avenue. When Mariah and G.W. left between 10:00 and 11:00 p.m., G.W. had no visible injuries. D.H. was concerned that Mariah was taking G.W. to Pearson's home. Mariah had previously told D.H. that Pearson spanked the baby for pulling another child's hair.

D.H. had never observed J.W. beat or hurt the baby. J.W. was not present in the family home at all the week that G.W. was taken into urgent care.

***The Defense Case***

Based upon G.W.'s injuries, it was undeniable that something had happened to him. Trial counsel adduced evidence showing that residents at the Woodrow Avenue home were generally uncooperative with law enforcement. She further observed that there was no doubt that G.W. had been severely neglected and that his injuries were sustained at different periods of time. According to trial counsel, these injuries could not have resulted from one night with Pearson.

With respect to Pearson's admissions made during police interrogation, trial counsel asserted that Pearson "was clearly defeated" by the detectives. As to Mariah's statements identifying Pearson as the cause of the baby's injuries, trial counsel opined that Mariah was a suggestive individual, who had lied multiple times. Her statements inculpating Pearson in the baby's beating were merely statements from a suggestive individual, parroting back what detectives had said to her.

**Testimony of Dr. Michael Musacco**

Dr. Michael Musacco was a clinical psychologist who testified for the defense at both Pearson and Mariah's trials. In October 2018, Dr. Musacco conducted a psychological evaluation of Mariah to assess her intellectual functioning. The evaluation was conducted at the request of the family court to ascertain Mariah's suitability for parental rights.

The average person has an Intelligence Quotient (IQ) score of 100. Mariah had an IQ of 55, which is consistent with mild to moderate impairment. However, her adaptive functioning, which translates into her ability to make her way in the word, is more consistent with a mildly impaired person.

Mariah told Dr. Musacco that she met Pearson in May 2018 and moved in with him for about a month. Mariah claimed that Pearson had physically abused G.W. and had threatened her. She admitted that Pearson may have abused G.W. over the course of several weeks, but that she did not previously disclose this.

Mariah acknowledged that she saw bruises on G.W.'s face but waited 12 hours before taking him to the doctor because she was afraid that CPS would become involved and that she could lose custody of G.W. Mariah further claimed that she was concerned for her personal welfare because Pearson had threatened her.

According to Mariah, Pearson told Mariah to tell investigators that her brother, J.W., had abused G.W. Mariah acknowledged that she had lied to police.

Dr. Musacco concluded that Mariah knew that what she had done, or had failed to do with G.W., was wrong. He opined that Mariah had attempted to minimize her culpability because she wanted to regain custody of G.W.

## I. Pearson's Statements Made During Police Interrogation Were Voluntary

Pearson maintains that the trial court erred by admitting inculpatory statements he made during police interrogation because his statements were coerced by promises of

leniency if he confessed and threats of harsher punishment if he did not. Considering the totality of the circumstances, we are not persuaded that Pearson's statements were coerced.

### A.     Background

### 1.     The Interrogation

In reviewing the trial court's ruling on a motion in limine, we must consider the facts before the court at the time of its ruling, and not by reference to evidence produced at a later date. (See *People v. Welch* (1999) 20 Cal.4th 701, 739.) Thus, the pertinent facts are those adduced in the in limine proceedings.

In ruling on Pearson's motion to exclude his statements made during police interrogation, the trial court considered the parties' motions, arguments, the unredacted transcript and audio recording of the interrogation, and a written report by a police interrogation expert, Dr. Richard Ofshe, who opined that Pearson's inculpatory admissions were the product of police coercion. No witnesses testified at the hearing.

On May 26, 2018, at approximately 3:00 a.m., Pearson was handcuffed and escorted to the police department. He was questioned at the police station at 3:52 a.m. by Sergeant Bishop and Detective Beagley. Details about the interrogation room were not adduced at the in limine hearing.

At the commencement of the interrogation, Pearson was admonished pursuant to *Miranda*.[6] Pearson acknowledged that he understood his rights and it is undisputed that he did not invoke his *Miranda* rights at any point during the interrogation.

The interrogation lasted one hour and six minutes. During this time, Pearson did not ask for food or water, nor did he request to use the restroom.

At the commencement of the interrogation, Pearson claimed that Mariah's family was framing him for G.W.'s injuries, and that text messages between he and Mariah

---

[6] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

would demonstrate as much. The detectives replied that they had already seen those messages.

Pearson initially claimed that G.W. already had some black and blue marks on his face when he picked up Mariah and G.W. on Thursday, the night before G.W. was taken to urgent care. Pearson claimed that when Pearson asked Mariah what had happened to G.W., Mariah stated that her brother had beaten G.W. when she left the baby in her brother's care.

Pearson initially claimed that he and a friend picked Mariah and G.W. up on Thursday night at 11:00 p.m. They dropped Mariah and G.W. off at her friend's house in Oildale at 2:00 or 3:00 a.m. on Friday. Pearson then claimed they did not drop Mariah and G.W. off until sometime during the daytime, on Friday. When Sergeant Bishop asked Pearson how he got the time mixed up, Pearson stated that he was tired. After further questioning, Pearson stated that Mariah never actually went to her friend's house and that she had stayed the entire night with him on Thursday.

According to Pearson, G.W. had "[j]ust a little bit of bruising" on him when they picked G.W. and Mariah up, including, black and blue marks on his forehead and on and around his eye. When Pearson inquired about the baby's injuries, Mariah stated that her brother had beat the baby because the baby was crying.

Pearson stated that he stayed awake until his sister, A.P., left the house for work at 5:45 a.m., because he "wanted to make sure [G.W.] was alright." When Pearson's sister saw G.W., she asked, "[O]h my god what happened to him?"

A.P. told detectives that she did not know about G.W.'s injuries until she saw the baby on a video chat call on May 25th at 4:00 p.m. When detectives confronted Pearson with this fact, Pearson explained that he gets things mixed up because he is dyslexic. He further explained that there had been a video call in the morning as well.

Sergeant Bishop told Pearson that G.W. had been transferred to a children's hospital and due to the severity of his injuries, there was a possibility that he may not survive. They told Pearson to "be one hundred percent honest," and to tell them what happened because it would have a lot of bearing upon "where this goes from here." Detective Beagley stated that Mariah's brother had nothing to do with G.W.'s injuries, and that they needed Pearson to be completely honest.

Pearson remained subdued throughout the interview. He continued to deny beating the baby but now claimed that he left one detail out of his story: G.W. had jumped out of Pearson's arms when Pearson was holding him.

Sergeant Bishop remarked that Pearson had not left that out of his story, he was "flat out lying," and stated, "[t]he baby did not jump out of your arms, because a baby does not jump out of someone's arms and end up with multiple skull fractures and bruises all over his face.… This baby was beaten, okay?"

Pearson continued to deny responsibility for intentionally injuring G.W. and insisted that he did not beat or touch G.W. He maintained that G.W. had jumped out of his arms.

Pearson stated, "[I swear to God,] I don't know what happened." Detective Beagley replied, "If you're going to bring god in[to] this, you need to tell the truth." Pearson stated, "That's what I'm saying. I really don't know what happened."

Detective Beagley insisted, "That baby was beaten almost to death. We know what happened. We want to hear you say it. You know what happened." Pearson insisted that he did "did not beat him."

Sergeant Bishop shifted to an empathetic approach. He suggested that it is not unusual for a nine-month-old baby to cry incessantly, which can understandably frustrate a parent or caregiver. Sergeant Bishop continued to suggest that Pearson may not have

intended to hurt G.W., but that he may have gotten frustrated and lost his temper. He added that every parent does it.

Pearson continued to deny any knowledge as to how the baby ended up with the injuries he suffered and told the detectives they would have to ask Mariah about the injuries. Sergeant Bishop told Pearson that he may not have intended to hurt G.W., but suggested that Pearson "lost [his] temper," "got frustrated," and "made a mistake." Pearson denied losing his temper and claimed that "it takes a lot … for [him] to lose [his] temper." Sergeant Bishop commented that "[a] child is capable of pushing even the most sane man to his limits."

Pearson acknowledged that while "[G.W.] does cry" and "parents do get irritated," that is not something "in [his] agenda," suggesting he is not a violent person. He added that detectives could look at his records. Sergeant Bishop remarked that Pearson did have "a history of domestic violence type offenses," and that they had not even pulled his full criminal history yet.[7]

The detectives clarified Pearson's version of events thus far. According to Pearson, he was with Mariah and G.W. since Thursday evening at 10:00 or 11:00 p.m. until the time that she went to the hospital. Pearson claimed that he was with them the entire time, except for when he went for a walk and to the store.

Pearson claimed that at about 3:30 a.m., G.W. had jumped out of his arms, falling face first onto the concrete. He and Mariah did not arrive at the urgent care center with the baby until 6:00 or 7:00 p.m. that evening—nearly 14 hours later—because they had to walk there. Pearson claimed that G.W. had some injuries before the fall, including, cuts to his stomach and back, but confirmed that G.W. had suffered a cut to the bottom of his eye after he fell from Pearson's arms.

---

[7] The jury did not hear this portion of the interrogation. Nor did the jury hear a portion of the interview where Pearson stated he drinks and smokes with his best friend.

19.

Mariah refused to call for an ambulance or to take the baby to the hospital until Pearson's sister instructed her to do so. Mariah told Pearson that she did not want the baby to be taken away from her. After A.P. insisted that Mariah take the baby to the doctor, Pearson and Mariah took him to urgent care. Pearson left because he had to "get back home to [his] kid."

The detectives asked Pearson why he claimed Mariah's brother was responsible for G.W.'s injuries when Pearson also claimed that G.W. was not injured until he fell from Pearson's arms. Sergeant Bishop branded Pearson's story as "bullshit."

They also confronted Pearson about the severity of G.W. injuries, observing that the baby had multiple skull fractures, but no bruises on the top of his forehead (even though he had purportedly fallen on his face), abrasions where he scraped against the ground on his forehead, his eye was almost stollen shut, and he had bruises on his face, chin, shoulders, elbows and scratches on his back. Detective Beagley explained that G.W.'s injuries were not consistent with G.W. falling on his head, and that Pearson "need[ed] to be honest with [them] and tell [them] what happened cause [they were] not even getting the same story from [him]."

Pearson stated that he was going to tell them "exactly what happened," but began stumbling over his words. He apologized, explaining he was so "nervous" and "scared." Sergeant Bishop replied that telling the truth would help Pearson alleviate those feelings, calling Pearson's effort to implicate Mariah's brother "bullshit."

The following exchange ensued:

"Pearson: [G.W.] jumped and then he fell.

[¶] … [¶]

"[Sergeant] Bishop: … [H]e didn't just fall once. It's not physically possible.

"[Detective] Beagley: Those injuries are telling a very different story.

20.

"[Sergeant] Bishop:  The injuries is the physical evidence, okay?

[¶]  …  [¶]

"[Sergeant] Bishop:  Doctors that have gone to school for … a long time, way more educated than anybody in this room are going to be able to look at those injuries and say that this is evidence of this baby being either struck multiple times, thrown multiple times, slammed against the ground multiple times.  They … will be able to say for a matter of fact this could not have come from one fall and they have the evidence, the x-rays, the visible injuries on his body to prove it.  Okay?

"Pearson:  Well[.]"

Sergeant Bishop interrupted Pearson and made the following comments, which were referred to as the "long speech" by Dr. Ofshe.[8]

"[Sergeant] Bishop:  So unless – and I'll tell what's going to happen.  *If you don't start being honest, and this baby dies, you're going to be charged with a homicide, okay?*  Because you are not telling the truth and you [are] just beating around the bush and telling these different stories is not going to help your case, ok?  What is, is you being honest and telling us what really happened, ok?  We already know a very big portion of the truth of what actually happened and we're just waiting for you to be truthful, and tell us.  Tell us your version, tell us what happened."

[42-second period of silence]

"[Sergeant] Bishop:  Dayvone, people make mistakes okay.  The difference in what happens after you make a mistake is how you respond to it afterwards, okay?  *And that makes the difference whenever cases like this end up being looked at by judges and juries, okay?*  They don't always necessarily look at what happened during the accident, the fall, the crime, whatever you want to call it.  They don't always look at just that, okay?  They look at the response to the person that was involved afterwards and how they respond to it.  Now, if that person denies things, lies, tries to come up with any different story possible to get their butt out of trouble, and the evidence shows different, *juries and judges do not like that, ok.* Because they think this guy did something and he's coming up with all

---

**8**  The italicized and emboldened language reflects portions of the interrogation that Pearson places special emphasis upon in arguing that he was coerced.

21.

these bullshit stories, he's not remorseful for it.  You know, and their opinion is going to be screw him, give him everything that we can versus a person who says I messed up, I made a mistake and I'm sorry.  Whenever they see that, they can relate to that, respect it and show remorse."

[period of silence]

"[Detective] Beagley:  But it takes that person to tell the truth.

"[Sergeant] Bishop:  The ball is in your court here Dayvone.

"[Detective] Beagley:  (inaudible) the truth.

"[Sergeant] Bishop:  Only you can help yourself at this point, ok.  Takes a man to admit when he was wrong, or when he messed up.  When he made a mistake.  Anybody can sit there and lie and be a punk and come up with a hundred different excuses and try to blame anybody but themselves, but it takes a man to admit that you know, he screwed up, he made a mistake.  He lost his temper, got frustrated and that's what makes all the difference is how you act after something- something happens.  So how do you want it to be for you?"

Pearson stoically commented, "Well, at the end of the day we're all human beings we all mess up."  He maintained that G.W. had fallen from his arms, by accident.

When Sergeant Bishop asked Pearson what else had caused G.W.'s injuries, Pearson admitted that he had become irritated with the baby.  He claimed that he had struck G.W. twice with his backhand after G.W. began to cry when he fell from Pearson's arms.  Pearson did this to quiet the baby down.  According to Pearson, this occurred at 3:30 or 3:40 a.m. in the kitchen of his sister's home, where he brought the baby after the fall.  Pearson stated that he hit the baby a second time because he would not stop crying.

Pearson claimed that while he had caused some of the injuries to G.W., including the injuries to G.W.'s face and head, he did not know how the baby had sustained scrapes and abrasions to his forehead.  He admitted that while the strikes were not hard for a person, "for a baby," they were hard.  The second hit caused G.W., who was pulling up on Pearson, to fall and hit the back of his head "hard" on the tile floor.

22.

According to Pearson, this occurred in the kitchen of his sister's home at 3:30 or 4:00 a.m. on Friday, May 25, 2018. Mariah did not see the strikes occur because she was in the bedroom at the time. Pearson denied picking G.W. up by the legs.

Sergeant Bishop told Pearson that they wanted to relate the best and most accurate information to the doctors so they could properly treat G.W., and "[i]t has not bearing on the…case or any criminal aspect or anything whether [Pearson] [had] hit [G.W.] twice or twenty-five times" it did not matter.

Pearson replied, "beside the bruises and the … fractured skull in the back and him jumping that's about it." Pearson confirmed that the injuries to G.W.'s face and head came from the fall and the two backhanded strikes by Pearson. He denied causing G.W.'s other injuries, including a bruise on G.W.'s stomach.

### 2. Pearson's Motion to Suppress

Trial counsel filed a motion to exclude Pearson's statements to law enforcement. Just before voir dire, the trial court ruled that the prosecutor had proven, by a preponderance of the evidence, that Pearson's statements were voluntary, and therefore, admissible. The trial court based its ruling on an unredacted audio recording and transcript of the interrogation, Dr. Ofshe's offer of proof, as well as the prosecutor's statement of the case, which had explained what the detectives knew before the interrogation occurred.

The trial court found that the circumstances of the interrogation were not coercive, reasoning, "the detectives' manner was gentle and caring," "[t]he overall approach of the officers remained low key and the questions were generally short and not convoluted," "there [were] no forced-choice questions," the location of the interview was "not intimidating," and the interview was short. The trial court further observed that Pearson was able to engage in conversation with Sergeant Bishop and Detective Beagley and that he was asking questions during the interrogation.

23.

On August 25, 2020, the trial court held an Evidence Code section 402 hearing concerning the admissibility of expert testimony that trial counsel intended to offer. Dr. Richard Ofshe, a social psychologist with expertise in the psychological effects of coercive police interrogation tactics, opined that "to a reasonable degree of psychological certainty that Mr. Pearson was exposed to intentionally coercive interrogation systems that succeeded in manipulating him away from his initial denial of being the cause of [G.W.'s] injuries … into offering a confession to causing those injuries."

The trial court permitted Dr. Ofshe to testify as to his opinion, which would be relevant to the weight of Pearson's statements made during police questioning.

### 3. Dr. Ofshe's Trial Testimony[9]

Dr. Ofshe testified at Pearson's trial only. He discussed the development of the Reid interrogation technique and its adoption by law enforcement in the United States. According to Dr. Ofshe, it is the dominant interrogation method used by law enforcement today.

Dr. Ofshe gave examples of techniques that are consistent with the Reid method, including, the use of evidence ploys, where law enforcement officers use real or false evidence to link a suspect to a crime; blaming the victim for the crime; using leading questions; and suggesting a version of events that makes the crime seem less heinous, and therefore, morally acceptable; and linking that narrative to an outcome. For example, the suspect may be told that accepting the story will result in a more lenient treatment, but that the failure to accept the story will result in harsh treatment.

Dr. Ofshe reviewed the transcript and audio recording of Pearson's interrogation. He pointed out specific examples of Reid techniques employed by the detectives, including their suggestion that children understandably frustrate parents or caregivers.

---

[9] Although Dr. Ofshe's written report was offered at the in limine proceeding versus his testimony, we cite to Dr. Ofshe's trial testimony to avoid an unnecessary duplication of facts, since his written report is consistent with his trial testimony.

According to Dr. Ofshe, the detectives were introducing a motive for the crime, and making the crime seem excusable, which would encourage Pearson to confess.

Dr. Ofshe also discussed Sergeant Bishop's "long speech," which preceded Pearson's inculpatory admissions. Sergeant Bishop's speech commenced with the following statement: "[if] [y]ou don't start being honest and this baby dies, you're going to be charged with a homicide, okay, because you are not telling the truth and you are just beating around the bush." According to Dr. Ofshe, this was a "threat component of the choice" which encouraged Pearson to accept "the story that the interrogator has constructed for the crime."

Dr. Ofshe further opined that Sergeant Bishop's statement—"[P]eople make mistakes," and the difference is "how you respond to it afterwards," when it "end[s] up being looked at by judges and juries"— suggested that if Pearson confessed, he would receive more lenient treatment.

Sergeant Bishop's statement—"juries and judges do not like" when a person "com[es] up with all these bullshit stories" because "[h]e's not remorseful," and "their opinion is going to be screw him. Give him everything that we can. Versus a person that says I messed up. I made a mistake and I'm sorry."— suggested that, if Pearson did not confess, it would create an impression that he deserves the worst punishment. In Dr. Ofshe's opinion, it put "very, very strong pressure on the person who is subjected to it to choose to confess no matter what because confessing appears to be the rational thing to do."

According to Dr. Ofshe, Pearson's statements—"You know you get irritated somewhat and be like damn, this damn kid, you know?"—seemed to feed back into the motive offered by Sergeant Bishop and Detective Beagley. When Pearson said he "got a little irritated," he was "feeding things back" to the detectives.

25.

Dr. Ofshe acknowledged that, at many points, Sergeant Bishop and Detective Beagley had asked Pearson to tell them what had happened, versus suggesting what had occurred. They also never suggested details of the crime Pearson had mentioned, including, how many times he struck G.W., that he hit G.W. after the baby stood up, and the hand and manner in which Pearson had hit G.W. Nor did they suggest a narrative that would explain the bruises on G.W.'s face, or the fact that G.W. had fallen and hit his head on the tile floor.

## B.  Legal Principles

"The Self-Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.' " (*Withrow v. Williams* (1993) 507 U.S. 680, 688, U.S. Const., Amend. 5.) The Fifth Amendment bars the use, in federal cases, of involuntary confessions made in response to custodial interrogation. (*Withrow v. Williams*, at p. 688; *Malloy v. Hogan* (1964) 378 U.S. 1, 6 ["the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States"].) Thus, before a confession can be used against a defendant, the prosecution has the burden of proving, by a preponderance of the evidence, that it was voluntary. (*People v. Wall* (2017) 3 Cal.5th 1048, 1066; *People v. Cahill* (1994) 22 Cal.App.4th 296, 310 (*Cahill*); *People v. Kelly* (1990) 51 Cal.3d 931, 947.)

"On appeal, we accept the trial court's factual findings as to the circumstances surrounding the confession, provided they are supported by substantial evidence, but we review de novo the ultimate legal question of voluntariness." (*People v. Battle* (2021) 11 Cal.5th 749, 790.) Where, as here, the entire interrogation is recorded, the appellate court may conduct its own review of the totality of the circumstances in determining whether the defendant's confession was involuntary and therefore inadmissible. (*People v. Linton* (2013) 56 Cal.4th 1146, 1177; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 216.)

" '[N]o single factor is dispositive in determining voluntariness.' " (*People v. Williams* (1997) 16 Cal.4th 635, 661.)  Rather, we evaluate the totality of the circumstances to determine "whether the defendant's ' "will has been overborne" ' by coercion." (*People v. Williams* (2010) 49 Cal.4th 405, 436.)  Relevant factors include the location of the interrogation, whether the interrogation was repeated or prolonged, whether the defendant was deprived of food or sleep, and whether the officers made threats or promises or used deceptive practices, among others.  (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Dykes* (2009) 46 Cal.4th 731, 752; *People v. Linton*, *supra*, 56 Cal.4th at p. 1178.)

## C.     Analysis

Pearson contends his statements made during police interrogation were coerced by threats and promises of leniency, as well as other improper interrogation techniques.  He relies upon the following facts to support his assertion:  he was interrogated at the police station at 4:00 a.m., he was questioned for more than an hour, the detectives used a "carrot-and-stick approach" during the interrogation, they told him they already knew the facts, they stated that the jury would not believe defendants that lie and that he would likely receive more lenient treatment if he confessed, he might be convicted of murder if the baby died, and they purported to empathize with anyone that might become frustrated enough to strike a crying baby.

We begin our analysis with the alleged threat/false promise of leniency since that is Pearson's most compelling argument.

### 1.  Promise of Leniency/Improper Threat

" '[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary....  Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest

course of conduct," the subsequent statement in response will not be considered involuntarily made.' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)

However, " ' "if ... the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." ' " (*Holloway, supra,* 33 Cal.4th at p. 115.) "The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (*People v. Hill* (1967) 66 Cal.2d 536, 549.) Thus, "even a mild promise of leniency" is prohibited. (*Brady v. United States* (1970) 397 U.S. 742, 754; see *People v. Neal* (2003) 31 Cal.4th 63, 79 [a statement is involuntary if " ' " 'obtained by any direct or implied promises, *however slight*.' " ' "], italics added.)

"Since threats of harsh penalty often contain an implicit promise of more lenient treatment, they are treated as promises of leniency." (*Cahill, supra,* 22 Cal.App.4th at p. 311.) That does not mean however that a threat of harsh punishment, including threatening the death penalty, will invariably contain an implicit promise of leniency. (See e.g., *People v. Spencer* (2018) 5 Cal.5th 642, 675, 671 [interrogating officer's isolated remark about the death penalty, " 'if you don't think I can't prove this case, if you don't think I can't fry you, you're sadly mistaken,' " among other statements, did not amount to a promise of leniency].) "[A] constitutional violation will be found 'only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a "promise [of] leniency in exchange for the suspect's cooperation." ' " (*Id.* at p. 675, citing *Holloway, supra*, 33 Cal.4th at p. 115.)

With these principles in mind, our inquiry is two-part. First, we must determine whether a threat or clearly implied false promise of leniency was made. Second, if such a threat or promise was made, we must determine whether it was a motivating cause of

Pearson's incriminating statements. (*People v. Johnson* (1969) 70 Cal.2d 469, 478 [a promise of leniency must be "a motivating cause of the confession"].)

### a. Sergeant Bishop Alluded to Leniency in Exchange for a Confession

"The application of the axiom that involuntary confessions are not admissible is not always a simple matter; the concept of voluntariness is multifaceted and has been described as a ' "potential morass." ' " (*Cahill*, *supra*, 22 Cal.App.4th at p. 310.) As the proceeding cases illustrate, there is no bright-line test for voluntariness; the determination is necessarily fact specific.

In *Cahill*, the defendant was convicted of first degree murder with special circumstances based upon the fact that the murder occurred during the course of a burglary, robbery, and rape. (*Cahill*, *supra,* 22 Cal.App.4th at p. 300.) After Cahill was *Mirandized*, police officers told him they had irrefutable physical evidence placing him inside the victim's home, the location where the victim was murdered. (*Cahill*, at p. 303.) An officer told Cahill that he could only help himself by talking and falsely represented that Cahill could avoid a conviction for first degree murder if Cahill admitted that he was inside the house, that he had knowledge of the killing, but that the murder was not premeditated. (*Id*. at p. 314.) This was a materially deceptive explanation of the law of murder in California, as Cahill could still be convicted of felony murder. (*Id*. at p. 315.)

Our Supreme Court found that Cahill's confession was coerced by a false promise of leniency—that he could avoid a first degree murder conviction by admitting to the killing but stating it was not premeditated, as well as misleading representations about the law of murder. (*Cahill, supra*, 22 Cal.App.4th at p. 314.) The court explained that while police deception is generally permissible, such deception cannot include a false promise of leniency. (*Id*. at p. 315.)

In *People v. Flores* (1983) 144 Cal.App.3d 459 (*Flores*), a case relied upon by Pearson, an interrogating officer told Flores, the suspect in a robbery/murder, that he " 'could go to the ... gas chamber' " and added, " '[m]aybe that's not so, you know, but you're the only one that knows that.' " (*Id.* at pp. 466, 471.)  By telling Flores that only he could help himself " 'out of this mess,' " the officer implied that "[o]nly by confessing his involvement in the decedent's death could [Flores] avoid the possible death penalty." (*Id*. at p. 471.)  Then, exacerbating the situation, police suggested that if Flores provided a version of events that supported a claim of self-defense, he might be released on his own recognizance until trial.  (*Id.* at pp. 471-472.)

Flores broke and made inculpatory statements.  (*Flores, supra,* 144 Cal.App.3d at p. 472.)  On appeal, this court ultimately concluded that Flores's statements were unlawfully induced by the combined implied threats and promises made by the interrogating officers.  (*Ibid*.)

In *People v. Brommel* (1961) 56 Cal.2d 629 (overruled on another ground in *Cahill*, *supra*, 5 Cal.4th at pp. 509-510, fn. 17), the defendant was suspected of murdering his infant daughter.  (*People v. Brommel*, at p. 631.)  Brommel insisted that he had never beaten or struck his daughter, despite vigorous urging and suggestions from the officers that they knew that he had done so.  (*Id.* at p. 633.)  During the interrogation, one of the officers told Brommel, " '[I]f we just wrote one word across there, Liar, that would-you can go up before that judge and you can ask him for all the breaks in the world, and he is not going to believe you because when a man tells a lie, then even the truth becomes a lie because he is branded as a liar.'  [¶]  'Now if you want to meet that judge that way, if you want to meet your maker that way, well, brother, that is up to you.' " (*Ibid*.)  Brommel subsequently confessed.  (*Id*. at p. 634.)

Our Supreme Court held that Brommel's confession was involuntary and therefore inadmissible.  (*People v. Brommel, supra,* 56 Cal.2d 629 at pp. 633-634.)  The court

30.

explained that the officer's statement was both a threat and an implied promise of leniency. (*Ibid*.)[10]

In contrast, in *Holloway* a detective mentioned in passing to Holloway that he was investigating a "death penalty case," and alluded to avoiding the death penalty if the murders were accidental or "resulted from an uncontrollable fit of rage during a drunken blackout." (*Holloway*, *supra*, 33 Cal.4th at pp. 112-117.) The threat of the death penalty was not hypothetical. Holloway, who was suspected of killing two young women in their home, with signs of sexual assault, "was a clear candidate for capital prosecution." And, based upon Holloway's own interrogation, this was not a surprise to him. (*Id*. at pp. 115-116.)

On appeal, our Supreme Court found that Holloway's incriminating statements made during the course of his interrogation were voluntary. The court observed that the detective "gave [Holloway] no such misleading assurances. No specific benefit in terms of lesser charges was promised or even discussed, and [a detective's] general assertion that the circumstances of a killing could 'make[] a lot of difference' to the punishment, while perhaps optimistic, was not materially deceptive." (*Holloway, supra*, 33 Cal.4th at p. 117; see also, *id.* at p. 116 ["[t]o the extent [the detective's] remarks implied that giving an account involving blackout or accident might help [the] defendant avoid the death penalty, [the detective] did no more than tell [the] defendant the benefit that might ' "flow[] naturally from a truthful and honest course of conduct" ' "].)

---

**10**    Pearson also directs this court to *People v. Denney* (1984) 152 Cal.App.3d 530. There, the interrogating officers presented a false hypothetical to the defendant, suspected of a robbery/murder, which suggested that the defendant would receive leniency if he made a full confession. (*Id*. at pp. 541-542.) Not only was the promise of more lenient treatment more clearly implied than any hypothetical promise here, the interrogating officers in *Denney* failed to honor the defendant's request for an attorney, violating his *Miranda* rights. (*Id*. at pp. 538-540.) We do not discuss Denney further as it is clearly distinguishable on its facts.

31.

Finally, in *People v. Zabelle* (2022) 80 Cal.App.5th 1098 (*Zabelle*), a case relied upon by the Attorney General, the admission of Zabelle's confession made during police interrogation was upheld despite his claim that the interrogation was improperly coercive. Zabelle identified two statements that he asserted were improper promises of a benefit or leniency in exchange for a confession. First, an interrogating officer told Zabelle, " '[T]here is a very critical time where you can earn possibly some consideration.' " (*Id.* at p. 1107.) Second, that same officer stated, " '[W]e can't make any guarantees but sometimes being honest and up front, admitting your involvement and—and what you did can go a[]ways to showing your remorse' and '[s]ometimes that works in your favor. Sometimes it doesn't." (*Ibid.*)

The appellate court found the first statement too vague to amount to a promise of anything. (*Zabelle, supra*, 80 Cal.App.5th at p. 1107.) With respect to the second statement explaining that an early showing of remorse might earn Zabelle some consideration, the court concluded that the detective had done nothing more than point out the benefits " ' " 'which flows naturally from a truthful and honest course of conduct.' " ' " (*Ibid.*, see, Cal. Rules of Court, rule 4.423(b)(8) [for sentencing purposes, it is a factor in mitigation if "[t]he defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process"].)

In the case at bench, the detectives' tactics were not as patently egregious as those employed by the officers in *Cahill* and *Flores*, but they did more than simply point out the benefits that might "flow[] naturally from a truthful and honest course of conduct." (*People v. Johnson*, *supra*, 70 Cal.2d 469, 479.) Sergeant Bishop initially told Pearson that G.W. might not survive his injuries. The record from the in limine proceedings fails to show that the detectives were informed that G.W. might not survive his injuries. As the testimony from Pearson's trial would ultimately bear out, this was either a ruse or

32.

Sergeant Bishop's unsubstantiated opinion, communicated in such a manner that a reasonable person might have believed that this was a medical opinion.[11]

The "use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088; see e.g., *People v. Thompson* (1990) 50 Cal.3d 134, 167, 170 [that the interrogating officers' false statements to the defendant that police found physical evidence linking him to the victim's death did not render the defendant's confession involuntary].)

Here, Sergeant Bishop's statement about G.W. possibly not surviving his injuries might encourage Pearson to talk but it was not the type of representation that would induce him to make an untrue statement. Indeed, Pearson continued to deny beating or intentionally harming G.W. after Sergeant Bishop made this statement and after Detective Beagley pointed out that the "baby was beaten almost to death."

---

**11** At trial, Sergeant Bishop admitted that no one had informed him that G.W.'s injuries were going to result in death. Trial counsel asked Sergeant Bishop, "Based on your observations of [G.W.] or anyone you spoke to, did you have any reason to believe at that point." Trial counsel withdrew her question before Pearson could answer and then asked, "So you had no knowledge at this point that these injuries would result in the death of [G.W.]."

Sergeant Bishop replied, "I didn't know if he was going to die or not. I just know he had skull fractures and he looked really messed up." Thus, it is unclear if Sergeant Bishop used a ruse to elicit a confession from Pearson, or if he genuinely believed, based upon his honest but unsubstantiated opinion, that the baby was not going to survive. It is also unclear whether Pearson understood that Sergeant Bishop was offering a non-qualified medical opinion when he stated the baby might not survive. The issue was not explored at Pearson's trial nor on appeal. Moreover, trial counsel did not renew her motion to suppress Pearson's statements at trial based upon Sergeant Bishop's representation. We therefore presume, that while the admissibility of Pearson's confession was preserved for appeal, Pearson does not challenge Sergeant Bishop's representation concerning the baby's possible death.

Where the interrogation arguably took a turn however occurred when Sergeant Bishop linked the baby's possible death to a threat during the "long speech." Following repeated extortions for Pearson to "tell the truth," Sergeant Bishop told Pearson, "If you don't start being honest, and this baby dies, you're gonna be charged with a homicide, …." Sergeant Bishop added:

> "Because you are not telling the truth and you just beating around the bush and telling these different stories is not going to help your case, okay? What is, is you being honest and telling us what really happened, okay? Cause we already know more than you're telling us. Ok? We already know a very big portion of the truth of what actually happened and we're just waiting for you to be truthful, and tell us. Tell us your version, tell us what happened. Dayvone, people make mistakes ok. The difference in what happens after you make a mistake is how you respond to it afterwards, okay? And that makes the difference whenever cases like this end up being looked at by judges and juries, okay? They don't always necessarily look at what happened during the accident, the fall, the crime, whatever you want to call it. They don't always look at just that, okay? They look at the response to the person that was involved afterwards and how they respond to it. Now, if that person denies things, lies, tries to come up with any different story possible to get their butt out of trouble and the evidence shows different, juries and judges do not like that, ok. Because they think this guy did something and he's coming up with all these bullshit stories, he's not remorseful for it. You know, and their opinion is going to be screw him, give him everything that we can versus a person who says I messed up, I made a mistake and I'm sorry. Whenever they see that, they can relate to that, respect it and show remorse."

Although Sergeant Bishop's statement was qualified by the death of the baby, an event which may or may not occur, it was nonetheless conveyed as a threat. (*Cahill, supra,* 22 Cal.App.4th at p. 311 ["a 'promise' is not restricted to representations

34.

concerning the future conduct of the person making the promise," it also "describe[s] promises of action or inaction by third persons, as in a guaranty, and even to a promise of the occurrence of events not within human control, as in a warranty of an existing or past fact"].)

Sergeant Bishop's statements could be construed to have conveyed "that by cooperating and telling what actually happened [Pearson] might not be accused of or found guilty of … murder (i.e. more lenient treatment by the court or jury)." (*People v. Johnson*, *supra*, 70 Cal.2d at p. 479.) If G.W. died, and Pearson admitted he had never intended to kill the baby, but he admitted to striking the baby, he could possibly be charged only with involuntary manslaughter. "To someone unskilled and uncounseled in the law it might have offered a hope ... that he might be cleared of [more] serious charges." (*Ibid*.)

An offer of leniency in exchange for a confession was not as clearly implied here as in *Flores*, where officers suggested that if Flores discussed the crime, he could possibly be released on his own recognizance until trial. (*See Flores, supra*, 144 Cal.App.3d at pp. 471-472). Nonetheless, a benefit was still implied.

Compounding the issue, Sergeant Bishop's statement about a possible homicide charge was then almost immediately followed by advising Pearson that lying would agitate the jury and the judge, and that if Pearson's version of events were proven to be false at trial, his dishonesty and lack of remorse would result in the maximum sentence possible. Declaring that Pearson's dishonesty would agitate the judge and jury was not, by itself, problematic. "No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence." (*People v. Carrington* (2009) 47 Cal.4th 145, 174; see, e.g., *People v. Case* (2018) 5 Cal.5th 1, 25-26 [finding the defendant's incriminating statements were not coerced where detectives told the defendant he was facing the death penalty, that he would be

better off if he confessed, and that providing an explanation could benefit him " 'in the long run' "].)

It was also not improper for Sergeant Bishop to suggest that a showing of remorse would mitigate his potential punishment.  An early showing of remorse is, after all, a factor in mitigation considered at sentencing.  (See *People v. Andersen* (1980) 101 Cal.App.3d 563, 579 [statements by police communicating that a showing of remorse is a factor which mitigates punishment is "a truthful legal commonplace with which all persons familiar with criminal law would agree"]; accord, *Zabelle, supra*, 80 Cal.App.5th at p. 1107.)

However, when woven into the tapestry of the interrogation, Sergeant Bishop's statement conveyed the following:  Pearson could face a homicide charge (murder or involuntary manslaughter) if he did not "start being honest"; the fact that the baby was intentionally "struck," "thrown," or "slammed against the ground multiple times" could be proven, with certainty, by medical experts; and Pearson's continued dishonesty would cause the judge and the jury to "give him everything that [they] can," i.e., to impose the maximum possible sentence.  If a reasonable person understood he or she might be prosecuted for murder, and the physical evidence told a story of severe injuries being intentionally inflicted upon a baby, they could be coerced into minimizing their responsibility by adopting a narrative that would support involuntary manslaughter.  (See generally, *People v. Tate* (2010) 49 Cal.4th 635, 684 [opining that falsely representing that a crime victim has died could motivate a suspect to confess to less culpable facts to escape liability for murder].)  But we are not persuaded that Pearson was in fact coerced.

As demonstrated by the preceding analysis, substantial effort is required to reach the conclusion that Sergeant Bishop's long speech threaded the needle between conveying a threat *and* a clearly implied promise of leniency.  Simply because the aforementioned deductions are possible does not mean that Pearson in fact made these

deductions during the interrogation. But, assuming Sergeant Bishop's long speech crossed the line, considering the totality of the circumstances, there is insufficient evidence that Pearson's subsequent inculpatory statements were proximately caused by the improper comments.[12] Our analysis is fully set forth below.

### b. *The Motivating Cause of Pearson's Statements*

Whether a coercive police tactic was used and whether it motivated the subject's statements are two separate questions. (*People v. Vasila* (1995) 38 Cal. App. 4th 865, 873.) "Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 347, citing *People v. Bradford* (1997) 14 Cal.4th 1005, 1041.)

" 'A confession is "obtained" by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by "proximate" causation.... The requisite causal connection between promise and confession must be more than "but for": causation-in-fact is insufficient.' " (*People v. Tully* (2012) 54 Cal.4th 952, 985-986, citing *People v. Benson* (1990) 52 Cal.3d 754, 778.) Thus, the improper threat or promise must actually induce the subject

---

**12** Although not addressed by the parties, we further observe that at the conclusion of the interrogation, Sergeant Bishop told Pearson that, "*It has no bearing on the … case or any criminal aspect or anything whether you hit [G.W.] twice or twenty-five times it really doesn't. So, I just want to make sure that you aren't leaving anything out and if you are now is the time.*" Pearson replied, "beside the bruises and the … fractured skull in the back and him jumping that's about it."

Sergeant Bishop's statement was potentially misleading as the nature and severity of the injuries Pearson inflicted upon G.W. would undoubtedly be relevant to a criminal prosecution against him. However, because Pearson had already admitted to causing the baby's "head injury" before this improper representation was made, even though he did not specifically state that the injury was at the back of the baby's skull, Sergeant Bishop's statement was not prejudicial.

to make incriminating statements rather than be a "but for" cause of the subject's statements. (*Hutto v. Ross* (1976) 429 U.S. 28, 30; accord, *People v. Benson*, at pp. 778-779; *People v. Lucas* (1995) 12 Cal.4th 415, 442.) " 'If the test was whether a statement would have been made but for the law enforcement conduct [(cause-in-fact)], virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action.' " (*People v. Benson*, at pp. 778-779, citing *U.S. v. Leon Guerrero* (9th Cir. 1988) 847 F.2d 1363, 1366, fn. 1.)

"Whether the defendant lost his free will and made involuntary statements does not rest on any one fact, *however significant it may seem.*" (*People v. DePriest* (2007) 42 Cal.4th 1, 34-35, italics added; *People v. Williams*, *supra*, 16 Cal.4th at p. 661 ["no single factor is dispositive in determining voluntariness"].) Rather, causation is determined by the totality of the circumstances. (*People v. Winbush* (2017) 2 Cal.5th 402, 452.)

In considering the totality of the circumstances, we consider "both the characteristics of the accused and the details of the interrogation." (*Schneckloth v. Bustamonte*, *supra*, 412 U.S. at p. 226; *People v. Tully, supra,* 54 Cal.4th at p. 986, citing *People v. McWhorter, supra,* 47 Cal.4th at p. 347.) "[T]he standard of proof on the question of causation is a preponderance of the evidence." (*Cahill, supra,* 22 Cal.App.4th at p. 316.)

The available record forecloses us from conclusively determining whether Pearson's admission to intentionally striking G.W. was proximately caused by Sergeant Bishop's statements, rather than by Pearson's demonstratable falsehoods and the mounting evidence against him. We have no doubt that Sergeant Bishop's comments were a cause in fact of Pearson's ensuing incriminating statements. Indeed, for the purpose of this appeal, we assume that to be the case. But the question is whether Sergeant Bishop's statements were so manipulative or coercive that they deprived

Pearson of his ability to make an autonomous decision to confess. (See *People v. Massie* (1998) 19 Cal.4th 550, 576.)

Several factors support the conclusion that Pearson was not coerced. First, the dominant focus of the interrogation was the strong physical evidence against Pearson, including the baby's injuries, which could not be explained by one accidental fall. It was not the threat of a homicide prosecution. (Cf. *Cahill, supra*, 22 Cal.App.4th at p. 316 ["[w]here the dominant focus of an interrogation is an implied promise of leniency and a confession ensues, absent adduction of countervailing evidence… the confession must be attributed to that implied promise"].) Pearson's contradictory stories, flight from the urgent care facility, and ill-conceived attempt to frame J.W. for causing the baby's injuries only pointed the finger more prominently at Pearson. Pearson could not overcome the strong evidence implicating him in the crime, and he appeared to have realized that the interrogating officers would not accept his version of events.

Second, although Pearson's incriminating statements were made shortly after Sergeant Bishop's long speech, the bombshell revelation that the baby might not survive was dropped early during the interrogation, 20 minutes before the long speech occurred. Rather than compunction, the revelation was met with continued denials of wrongdoing by Pearson, who insisted that he did not beat or strike the baby.

Upon hearing that G.W. might not survive his injuries, a reasonable person in Pearson's position would have known that they would likely face criminal prosecution for manslaughter or even murder if the victim did not survive. Consequently, it is unlikely that the threat of a homicide prosecution actually caused Pearson to confess.

Finally, even when he was threatened with criminal prosecution for homicide, Pearson persisted in downplaying his responsibility for the complete extent of G.W.'s injuries. He deliberately tailored his answers to the detectives' questions in a way that favored his own self-interest. Although he admitted striking G.W. intentionally by

backhanding him twice, Pearson minimized the severity of the injuries that he had inflicted upon the baby. For example, he denied any knowledge about how G.W. had sustained scrapes or abrasions on his forehead and stomach, and he denied dragging the baby on the tile floor.

In addition, Pearson continued to maintain that G.W. had jumped out of his arms, causing the baby's facial injuries. A story which was never corroborated, despite Pearson's assertion that his best friend had witnessed the incident. And, as Dr. Ofshe himself observed during his testimony at trial, Pearson offered details of the crime that were not suggested to him by the detectives. " 'This is not the behavior of one whose free will has been overborne.' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 444, quoting *People v. Johns* (1983) 145 Cal.App.3d 281, 293.)

We further observe that other than Sergeant Bishop's long speech, none of the circumstances of the interrogation support the conclusion that Pearson's statements were coerced. The interrogation recording reveals that the detectives utilized techniques that could fairly be characterized as aggressive. For example, they insisted that Pearson was being untruthful, citing their superior knowledge of the events. They highlighted discrepancies between Pearson's statements and the physical evidence, including the number and severity of G.W.'s injuries. And they provided Pearson with a less culpable explanation for G.W.'s injuries, suggesting that he may have injured the baby out of understandable frustration. These were acceptable interrogation techniques.

" '[Police] [q]uestioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect.' " (*Holloway, supra*, 33 Cal.4th at p. 115; see, *People v. Jones* (1998) 17 Cal.4th 279, 299 [it is not improper for an interrogator to imply superior knowledge about a crime than he or she actually possesses]; see also, *People v. Carrington*, *supra*, 47 Cal.4th at p. 171 [police may suggest "possible

explanations of the events and offer[] [the] defendant an opportunity to provide the details of the crime"].)

Consistent with the trial court's conclusion, the atmosphere surrounding the questioning of Pearson was not coercive. Although the detectives acknowledged that at some point, the tone of the interrogation became accusatory, at all times, they spoke calmly to Pearson and assumed a friendly demeanor. The interrogation was not, on balance, coercive.

We acknowledge that factors weigh in favor of finding that the interrogation was coercive, including, the fact that Pearson was handcuffed, the interrogation occurred at a police department, and it was held at 3:52 a.m.[13] Considered independently or in their totality, none of these factors compel the conclusion that Pearson's will was overborne.

With respect to Pearson, there is nothing in the record which supports the conclusion that his age, maturity, education, physical condition, or mental health may have rendered him particularly vulnerable to the type of interrogation techniques employed here. (See, e.g., *Cahill, supra*, 22 Cal.App.4th at p. 317 [defendant was 18 years old with an eighth-grade education]; *In re Elias V.* (2015) 237 Cal.App.4th 568, 578 ["more than one-third (35 percent) of proven false confessions were obtained from suspects under the age of 18"].)

Further, although Pearson could hardly be described as a seasoned criminal, he displayed some degree of criminal sophistication. Before his arrest, Pearson exchanged text messages with Mariah wherein he attempted to blame Mariah's brother for beating G.W. He also attempted to conceal his identity when he and Mariah finally took the baby

_____

[13] Pearson also stated he was tired during the interrogation, but as we interpret the record, this statement was more likely an attempt to explain his inconsistent statements rather than deprivation of sleep. We find support for our conclusion based on the fact that at one point during the interrogation, Pearson also claimed that he mixed up details because he was dyslexic.

to urgent care for treatment, and he fled before the police arrived. Pearson was clearly aware of the fact that he would be a suspect and sought to exculpate himself before his arrest.

Although Pearson remarked that he was "nervous" and "scared" during the interrogation, that does not support his assertion that he was coerced into making inculpatory statements. Pearson was not so nervous or scared that he was unable to parry the detective's questions or ask them questions. He was simply unable to keep his story straight, suggesting he was being dishonest.

There is no doubt that Sergeant Bishop and Detective Beagley's statements regarding the baby's possible death and the potential homicide charge brought this interrogation close to the line of coercion. Despite the fact that there was strong circumstantial evidence implicating Pearson, "confessions, 'as a class,' '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt [citation], ... that such confessions often operate 'as a kind of evidentiary bombshell which shatters the defense' [citation], ... [and therefore] that the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial." (*Cahill*, *supra*, 5 Cal.4th at p. 503.)

Thus, even where there is compelling evidence of guilt, the admission of a defendant's confession which was the product of police coercion will often be found prejudicial. (Cf. *Cahill*, *supra*, 5 Cal.4th at p. 505 [suggesting that the erroneous admission of an involuntary confession may be found harmless where, "there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence," the crime is videotaped, or the defendant is caught in the commission of the crime].)

Finding no error by the trial court's admission of Pearson's in custody statements, we do not address the Attorney General's argument that the admission of Pearson's

statements was harmless beyond a reasonable doubt. We raise this issue merely to emphasize that law enforcement must be mindful of the pitfalls of employing the type of tactics that were used during Pearson's interrogation.

**II.     The Trial Court's Denial of Counsel's Motion to Admit Mariah's Statements to a CPS Caseworker**

Pearson contends that the trial court erred in denying trial counsel's request to call a CPS caseworker to testify about statements made by Mariah claiming she falsely implicated Pearson in the baby's beating. Pearson specifically argues that the trial court erred by concluding the challenged statements were irrelevant, more prejudicial than probative, not against Mariah's penal interests (Evid. Code, § 1230), and inadmissible as prior inconsistent statements of a hearsay declarant (Evid. Code, § 1202).

As discussed further below, only one of the challenged statements was admissible as a prior inconsistent statement, but because there was ample evidence of Mariah's lack of veracity for the truth, the statement was cumulative and therefore properly excluded under Evidence Code section 352.

**A.     Background**

*1.     Mariah's Statements to CPS Caseworker Bonny Holt*

After the prosecution presented its case-in-chief, Pearson's trial counsel asked to call a CPS caseworker, Bonny Holt, to testify about Mariah's untruthfulness. Trial counsel sought to question Holt about statements made to her by Mariah wherein Mariah recanted her allegations against Pearson. Holt documented Mariah's statements in a report written for the juvenile court after G.W. had been removed from Mariah's custody:

> "I asked [Mariah] if [Pearson] has ever struck her anywhere on her body …
> and *she told me he has not*. I asked her if [Pearson] had ever pulled her hair
> or punched her and *she told me he has not*. I asked her if there is any
> reason that someone would say that he has and she said '*because I said he
> did*.' I asked her who she told this to and she said 'I told my mom.' I
> asked her if she was lying to her mother when she told her that [Pearson]
> had been physically abusive to her by punching her and pulling her hair and

43.

she told me that she *had lied to her mother and that he never had done those things. She stated that she also lied about [Pearson] being abusive to her to the Detectives investigating this case because, 'I was afraid' and was 'just telling them what I thought they wanted me to say.'* I asked [Mariah] if [Pearson] has ever raised his hand up in the air in a threatening manner to her during any argument they have ever had in their one month of dating and *she told me that he has not but she felt like he might.* I asked [Mariah] if she ever lived in [Pearson's] home and *she told me that she did not, she only visited him there and stayed the night on a few occasions with her son.* [¶] I asked [Mariah] if she has ever witnessed [Pearson] do anything [] else with regards to discipline or harming him in some kind of way. *She stated that she has not.* I then inquired as to the concern noted in the referral whereby it was reported and asked why someone would say that she has witnessed [Pearson] drag [G.W.] around on the tiled floor of [Pearson's] home and banging the child's head on the tile floor. [Mariah] told me that '*I made it up.*' I asked her if she was being honest with me as it was very important that I know the truth. *She told me that he never did that and that she made it up.*" (Italics indicate original highlighting by the trial court.)

The language italicized above reflects language highlighted by the trial court in consideration of its ruling. The trial court explained, after analyzing Mariah's statements, that they don't make sense without Holt's questions. The trial court reasoned however that a declaration against interest must be a statement that is complete in and of itself.

### 2.    *The Trial Court's Ruling*

The trial court explained that without the context of Holt's questions, only one of Mariah's statements is complete such that it could be considered a declaration: "[Mariah] told me that she *had lied to her mother and that [Pearson] never had done those things. She stated that she also lied about [Pearson] being abusive to her to the Detectives investigating this case because, 'I was afraid' and was 'just telling them what I thought they wanted me to say.'* "[14] However, none of Mariah's statements are disserving of her penal interests within the meaning of Evidence Code section 1230.

---

**14** Pearson disputes this point, asserting that even if Holt's questions were hearsay, she was available to testify at Pearson's trial, and would have provided the

With respect to trial counsel's assertion that Mariah's statements qualify as prior inconsistent statements, the trial court observed that Mariah's prior statements were introduced through the testimony of third-party witnesses, including Detective Beagley. It questioned whether these witnesses would have to be confronted with Mariah's inconsistent statements.

Following further argument by the parties, the trial court ultimately concluded that Holt's testimony was inadmissible under Evidence Code section 1202. The trial court further held that evidence of Mariah's statements was inadmissible under Evidence Code section 352, finding admission of the statements would be substantially more prejudicial than probative. The court observed there was already ample evidence adduced at trial showing that Mariah lied, and Mariah's statements to Holt would be cumulative of this evidence.

As a result of the trial court's ruling, Holt was excused as a witness. She did not testify at Pearson's trial.

## B.      Relevant Legal Principles

" 'The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation.' " (*People v. Turner* (2020) 10 Cal.5th 786, 822.) We review a trial court's ruling on the admissibility of evidence, including a decision that turns on the hearsay nature of evidence, for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) Under this standard, the trial court's decision may only be reversed if it was "so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion.

---

necessary context to Mariah's responses. In analyzing whether Mariah's statements were admissible as declarations against her interests or prior inconsistent statements, we have considered all of Mariah's statements made to Holt, and we assume that Holt's testimony would have been admissible and consistent with her written report. We therefore do not address the trial court's ruling on this point.

[Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

Pearson contends that Mariah's statements were admissible as declarations against her penal interests, an exception to the rule against hearsay (Evid. Code, §1230), and prior inconsistent statements, admissible to impeach Mariah's credibility (Evid. Code, § 1202). In examining the trial court's ruling, we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

### 1. Declarations Against Penal Interests (Evid. Code, § 1202)

To justify admission of each statement, Pearson had the burden of establishing: (1) the declarant is unavailable; (2) the declaration was against the declarant's penal interest when made; and (3) the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.)

The parties do no dispute that Mariah was unavailable as a witness. She was Pearson's co-defendant and had invoked her Fifth Amendment privilege not to incriminate herself. (Evid. Code, § 240, subd. (a)(1).) The parties disagree however on whether Mariah's statements were disserving to her own self-interests such that the statements qualify as declarations against her penal interests.

A declaration against interest is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441.) In *People v. Grimes* (2016) 1 Cal.5th 698, 711, our Supreme Court clarified that the exception also extends to statements "that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal

interest.' " (*Id*. at p. 715, quoting *People v. Samuels* (2005) 36 Cal.4th 96, 120-121.) Noting that "context matters," the court held that statements tending "to underscore [the declarant's] responsibility for the crime, rather than diminish it," are admissible as declarations against interest. (*People v. Grimes,* at p. 717.)

Contrary to Pearson's assertions, the net effect of Mariah's statements do not tend to implicate her as having caused G.W.'s injuries. Although Mariah's statements, if credited, tend to exculpate Pearson, Mariah neither directly nor indirectly inculpated herself or otherwise assumed responsibility for the baby's injuries.

More importantly, Pearson has not shown that Mariah's statements, documented in Holt's report, were made under sufficiently trustworthy circumstances to warrant their admission. " 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Grimes, supra*, 1 Cal.5th at p. 711.)

The record lacks sufficient assurances that Mariah's statements to Holt were sufficiently trustworthy. Considered in the context in which they were made, we are left with the inescapable conclusion that Mariah recanted her statements implicating Pearson in the baby's beating for two reasons. First, because Mariah was facing felony child endangerment charges based upon her failure to protect G.W. from Pearson. And second, because the criminal prosecution against Pearson and Mariah would prevent her from regaining custody of G.W., which Mariah desperately wanted. G.W.'s foster mother testified that Mariah was interested in reunification, although Mariah later learned that reunification would not be possible. Further, Dr. Musacco opined that Mariah was attempting to minimize her culpability because she wanted to regain custody of G.W.

"[S]ometimes a declarant who makes an inculpatory statement may have a substantial incentive to exculpate others." (*People v. Grimes, supra*, 1 Cal.5th at p. 716.) That was the case here. The trial court did not abuse its discretion by finding that Mariah's statements to CPS caseworker Holt did not qualify as statements against Mariah's penal interests.

## 2. Prior Inconsistent Statements (Evid. Code, § 1202)

Pearson further contends that Mariah's statements were admissible as prior inconsistent statements. Assuming he is correct, we conclude that Pearson has failed to demonstrate that the trial court abused its discretion by finding that Mariah's statements were cumulative, and therefore, inadmissible under Evidence Code section 352. Evidence that is relevant may nonetheless be cumulative and therefore excluded under Evidence Code section 352. (See *In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.)

To begin, we observe that under Evidence Code section 1202, prior inconsistent statements can be used to impeach statements admitted in evidence that were made by declarants who did not testify at trial. Thus, a hearsay declarant may be impeached by their inconsistent statements, whether or not they had been given the opportunity to explain or deny an inconsistency.

The inconsistent statements may be used, however, only for impeachment purposes. Consequently, unless the statements fall within some recognized hearsay exception, they may not be admitted for the truth of the matter asserted. (*Forest Lawn Memorial-Park Assn. v. Superior Court* (2021) 70 Cal.App.5th 1, 13 [" '[Evidence Code section 1235] provides that evidence of inconsistent statements made by a trial witness may be admitted to prove the truth of the matter stated. No similar exception to the hearsay rule is applicable to a hearsay declarant's inconsistent statements that are admitted under [Evidence Code] Section 1202.' "].) Because the hearsay declarant is not subject to cross-examination on their statements, there is not a sufficient guarantee of the

trustworthiness of their statements to warrant their admission as substantive evidence of the truth of the matter asserted. (Law Rev. Com. Comment to Evid. Code, § 1202.)

In view of these principles, Mariah's statements to Holt would only have been admissible under Evidence Code section 1202 for impeachment purposes and not for the truth of the matter asserted, i.e., to show that she fabricated the allegations against Pearson, blaming him for beating the baby. To this end, there was already ample evidence adduced at trial of Mariah's tendency to lie.

In addition to the fact that Mariah had changed her version of events to detectives and medical professions, often during the course of the same interview, Dr. Musacco, testified that Mariah acknowledged that she had made a conscious decision to lie for Pearson. Mariah's mother, D.H., also offered evidence of Mariah's tendency to lie. She provided specific examples of past instances where Mariah had lied to CPS and law enforcement and testified that Mariah frequently lied because of a cognitive impairment and to gain attention. Because there was already substantial trial evidence showing that Mariah frequently lied, the trial court did not abuse its discretion by ruling Mariah's statements to Holt were cumulative, and therefore, inadmissible under Evidence Code section 352.

The record does not support Pearson's claim of prejudice for this same reason. (See *People v. Watson* (1956) 46 Cal.2d 818 [reversal is required only when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].) Pearson's claim of prejudice is based upon the presumption that the jury would have been able to consider Mariah's statements for the truth of the matter asserted: that Mariah was recanting her allegations against Pearson.

However, under Evidence Code section 1202, Mariah's statements to Holt could only be considered for impeachment purposes, and not for the truth of the matter asserted.[15]

Pearson nonetheless contends that the exclusion of Mariah's statements was prejudicial because if the statements had been admitted, the corpus delicti rule would have precluded the jury from convicting Pearson based only upon his confession. According to Pearson, if the jury had heard testimony that Mariah had recanted her accusation against Pearson, there is a strong likelihood it would have discredited all of Mariah's statements. The corpus delicti rule does not apply in the manner Pearson suggests that it does.

Under the corpus delicti rule, " 'the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.' " (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1260, citing *People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169.) However, " '[t]he identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' " (*People v. Rosales,* at p. 1261, citing CALCRIM No. 359 ["[i]f other evidence shows that the charged crime … was committed, the identity of the person who committed it … may be proved by [defendant's] statements alone"].) The jury was instructed on this point during closing instructions.

Because the corpus delicti rule allows the identity of the perpetrator to be proven by a defendant's statements alone, Pearson's assertion of prejudice is meritless. Based

---

[15] The likelihood of jury confusion on this point is self-evident. Even with an admonition, it would have been nearly impossible for the jury to consider Mariah's statements only for their impeachment value and not for the truth of the matter asserted.

upon the foregoing, we conclude that Pearson has demonstrated neither error nor prejudice assuming error by the trial court's exclusion of Mariah's statements to Holt.

### III. The Admission of Mariah's Hearsay Statements to J.K., D.H., and Dr. Musacco

Pearson challenges the admission of statements made by Mariah to three witnesses who testified at Pearson's trial. First, the baby's foster mother, J.K., testified that Mariah had told her that Pearson had hurt the baby. Second, Maria's mother, D.H., testified that Mariah told her Pearson had previously spanked G.W. and had caused injuries to the baby on the day he was taken to urgent care. Finally, Dr. Musacco, Mariah's expert witness, testified that Mariah admitted that Pearson had abused both her and G.W., and that Pearson had previously threatened her.

It is undisputed that trial counsel failed to lodge a timely objection to the admission of these statements. Consequently, Pearson argues trial counsel rendered ineffective assistance of counsel by failing to object to the challenged testimony. He contends these statements were not only hearsay not within an exception, but that the statements were testimonial, violating his right to confrontation. We conclude that Pearson has failed to show trial counsel was constitutionally ineffective.

#### A. Background

##### 1. Discussions Concerning *Aranda/Bruton*

During in limine proceedings, trial counsel argued that Mariah's statements about Pearson abusing G.W. made to police when she was at the hospital should be excluded under *People v. Aranda* (1965) 63 Cal.2d 518 *(Aranda) and Bruton v. United States* (1968) 391 U.S. 123 *(Bruton)*.

"[T]he *Aranda/Bruton* rule declares that a defendant is deprived of his or her Sixth Amendment right to confront witnesses when a facially incriminating statement of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the declarant." (*People v. Gallardo* (2017) 18

Cal.App.5th 51, 68.) "However, because it is premised on the confrontation clause, ' "the *Bruton* rule, like the Confrontation Clause itself, does not apply to non-testimonial statements." ' " (*People v. Almeda* (2018) 19 Cal.App.5th 346, 362; *People v. Washington* (2017) 15 Cal.App.5th 19, 29 ["the *Aranda/Bruton* doctrine is grounded exclusively in the confrontation clause and can extend no farther than the metes and bounds of the clause defined by the United States Supreme Court"]; *People v. Cortez* (2016) 63 Cal.4th 101, 129, citing *Davis v. Washington* (2006) 547 U.S. 813, 824 ["[T]he high court [has] unequivocally held 'that the confrontation clause applies *only to testimonial hearsay statements* and not to [hearsay] statements that are nontestimonial.' "].)

To avoid *Aranda-Bruton* problems, the trial court impaneled dual juries—an alternative to severance. The trial court subsequently ruled that Pearson's statements made during police interrogation were admissible. Following the trial court's ruling, counsel withdrew her *Aranda-Bruton* objection to the admission of Mariah's statements to the police:

> "[THE COURT:] … [T]he Aranda-Bruton issue would belong to Ms. Bermudez [trial counsel for Pearson]. It was indicated to me that the defense has absolutely no objection to continue playing certain things which they didn't – I believe didn't feel met Aranda-Bruton concerns. And I am going to assume for tactical reasons if it is on the borderline, they did not concern themselves for tactical reasons that the rest of the interview could be played.
>
> "With that, Ms. Bermudez, your position?
>
> "The Court has stated what it understood it to be. Any additions, substractions [*sic*]or are you comfortable with the Court's statement?
>
> "[TRIAL COUNSEL]: Your Honor, just to add, after careful consideration of the evidence in this case … I did not have an objection to the statement."

Just prior to playing Mariah's third interview by police for the jury, trial counsel stated that she had a detailed discussion with Pearson "regarding the issues of Aranda-

52.

Bruton" and "the reasons as to the request for waiving the Aranda-Bruton issues" and Pearson was in agreement. The trial court asked counsel whether she was "waiving any Aranda-Bruton issues as to that interview," and trial counsel responded affirmatively. Trial counsel stipulated that the prosecutor could play the interview in its entirety.

While at the hospital, Mariah was interviewed by police four separate times. Her version of events changed not only between each interview, but often, during the course of each interview. She initially claimed that her brother, J.W., had injured the baby, then insisted G.W. had fallen on the ground by accident, and finally, she blamed Pearson for injuring G.W. Thus, trial counsel's strategy appeared to be geared toward showing that Mariah was a liar, undermining her credibility as to all of her claims.

### 2. The Challenged Testimony

#### i.  *Mariah's Statements to J.K.*

G.W.'s adoptive mother testified about some of her interactions and conversations with Mariah. J.K. described a text message exchange between her and Mariah that occurred in June 2018. J.K. warned Mariah to stay away from Pearson. With respect to G.W.'s injuries, Mariah stated that she and Pearson had not been fighting. She claimed that Pearson had hurt the baby because the baby "was crying too much." Mariah also claimed that she had observed Pearson dragging the baby on the living room floor. J.K. testified that Mariah's texts were consistent with what Mariah had previously told J.K.

#### ii.  *Mariah's Statements to D.H.*

Mariah's mother, D.H., testified as a witness for the prosecution. D.H. testified that she did not want Mariah to take G.W. over to Pearson's home on the night of May 24, 2018, because Mariah had previously told D.H. that Pearson had spanked the baby a few days earlier.

D.H. also testified that the police interviewed her at her home on May 25, 2018. When they left, D.H. contacted CPS caseworker Rutledge and told her that she thought

53.

Pearson might be abusing G.W. based on what Mariah had told her the night before. Mariah told her mother that Pearson had spanked the baby.

D.H. testified that the day after the baby was injured, Mariah told her mother that the baby sustained injuries at or from "Dayvone." According to D.H., the baby was uninjured the last time she saw him.

### iii. Mariah's Statements to Dr. Musacco

Dr. Musacco related statements by Mariah during an evaluation he conducted with her in October 2018, under court appointment regarding her parental fitness. According to Dr. Musacco, Mariah acknowledged that Pearson had physically abused her, and that Pearson told her to blame her brother for abusing G.W. Mariah claimed that she did not protect G.W. because she was afraid that Pearson might hurt her. Then, the following exchange occurred:

> "[PROSECUTOR]: And then [Mariah] said she denied that [Pearson] had hit her or physically abused her in the past but she told me[16] that he had threatened her. Period. [¶] She told you that as well, right?
>
> "[DR. MUSACCO]: Correct.
>
> "[PROSECUTOR]: Okay.… [Y]ou ask her if she … had done anything else wrong and she said that she kept [G.W.] clean all the time. Period. I'm a good mom but I made a bad decision. And you put in parenthesis [*sic*] being with [Pearson] in quotations. [¶] Is that something she told you?
>
> "[DR. MUSACCO]: That's exactly what she told me, yes.
>
> [PROSECUTOR]: … She acknowledged that [Pearson] may have abused her son over the course of

---

[16] The prosecutor was reading statements from Dr. Musacco's evaluation, dated October 1, 2018.

several weeks but she did not previously disclose this. That's something she told you as well, right?

"[DR. MUSACCO]: Yes, it is.

"[PROSECUTOR]: Through your conversation with her, she explained that she lied to the police, right?

"[DR. MUSACCO]: Yes."

### 3. Trial Counsel's Closing Argument

During closing argument, trial counsel argued that G.W. was living at the Woodrow Avenue house "when all of this was occurring," where he had been living for the last two months. She further observed that G.W.'s bruises were in different stages of healing, which supported the conclusion that he was not just injured on one night with Pearson. Trial counsel stated that Pearson had not been living with Mariah and G.W. and recounted compelling evidence that was adduced at trial showing that the baby had been neglected.

Although trial counsel acknowledged that something was happening to G.W., a fact which was irrefutable based upon the baby's injuries, those injuries could not have been caused by one night with Pearson. Mariah's claims to the contrary were lies, consistent with her overall propensity for dishonesty, in addition to the fact that she was a suggestive individual who parroted back facts posed by law enforcement.

### B. Relevant Legal Principles

To prevail on a claim of ineffective assistance of counsel, Pearson is required to make a two-part showing. First, he must establish that "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Kelly* (1992) 1 Cal.4th 495, 519-520.) Second, he must show that trial counsel's deficient performance was prejudicial. (*Ibid.*) Prejudice must be affirmatively shown; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

55.

reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

### C.     Analysis

The Attorney General submits that trial counsel made a strategic decision not to object to Mariah's hearsay statements related by D.H., J.K., and Dr. Musacco during their trial testimony. (See *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 ["[o]n a direct appeal a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission"]; accord, *People v. Lucas* (1996) 12 Cal.4th 825A; *People v. Carter* (2005) 36 Cal.4th 1114, 1189 ["[a] reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy"].)

According to the Attorney General, Mariah's challenged statements bolstered trial counsel's theory that Mariah was a well-known liar, and was therefore, lying about her statements to detectives blaming Pearson for injuring G.W. The statements Mariah made to Dr. Musacco are consistent with that strategy, since Mariah denied being abused by Pearson and then claimed otherwise during the course of the interview. She further admitted that she had lied to law enforcement, which supports trial counsel's theory that Mariah has a tendency to lie. This undermines her credibility, and in so doing, her claims implicating Pearson as having caused G.W.'s injuries. Thus, trial counsel's failure to object to the testimony of Dr. Musacco appears to be a matter of trial strategy.

However, Mariah's statements to J.K. and D.H. were more damaging than supportive of trial counsel's strategy. It is difficult to imagine how the admission of their testimony could have been helpful to Pearson's case and they tend to support Mariah's claims to detectives implicating Pearson as having caused the baby's injuries. We will

assume that trial counsel's failure to object to the admission of the challenged statements Mariah made to J.K. and D.H. was not a matter of trial strategy, and that these statements were hearsay not within an exception.[17]

We do not however accept Pearson's assertion that not only are the statements hearsay, they violated the *Aranda/Bruton* rule. "[B]ecause the confrontation clause applies only to testimonial hearsay statements, the *Aranda-Bruton* doctrine's Sixth Amendment protections likewise apply only to testimonial hearsay statements. (*People v. Tran* (2022) 13 Cal.5th 1169, 1196.) "Whether an out-of-court statement is testimonial turns on whether the 'objective evidence' indicates that the statement was obtained for the 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.' " (*People v. Washington* (2017) 15 Cal.App.5th 19, 28.)

Beyond Pearson's bare assertion, he does not explain how Mariah's statements to D.H. and J.K. are testimonial. The statements were not made with formality or solemnity, nor were they made for the primary purpose of establishing or proving facts for possible use in a criminal trial. Moreover, the fact that Mariah's statements to J.K. and D.H. would subsequently become relevant to a criminal prosecution does not mean that they were primarily obtained for this purpose. (See *People v. Romero* (2008) 44 Cal.4th 386, 422 ["statements are not testimonial simply because they might reasonably be used in a later criminal trial"].)

Assuming trial counsel erred by failing to object to D.H. and J.K.'s challenged testimony on hearsay grounds, a violation of state law, we are not persuaded that Pearson has met his burden of demonstrating prejudice. (*Strickland v. Washington*, *supra*, 466

---

**17** The trial court concluded that many of Mariah's statements were admissible as admissions of a party opponent (Evid. Code, § 1220), including, Mariah's statements to D.H. about witnessing Pearson strike the baby against the tile floor. We nonetheless presume, for the sake of argument, that the challenged statements are hearsay not within an exception.

U.S. at p. 697 [if the record reveals that an appellant cannot affirmatively demonstrate prejudice, we may resolve a claim of ineffective assistance of counsel on that basis alone].) Excluding the challenged testimony by J.K. and D.H., we are confident that the outcome of Pearson's trial would have been the same.

D.H. testified that the night before G.W. was seriously injured, Mariah and G.W. left the Woodrow Avenue home. Mariah's mother and sister did not observe injuries on the baby when Mariah and G.W. left. However, between leaving the Woodrow Avenue home and the point when Mariah finally sought medical treatment for the baby, G.W. had suffered a fractured skull, scratches, and abrasions all over his body. Urgent care staff immediately thought the baby had been abused when they initially saw him.

The fact that the baby had suffered physical abuse was undeniable based upon the nature and severity of his injuries. The only question was by whom.

Although the testimony by D.H. and J.K. was damaging and undoubtedly implicated Pearson as being the cause of the baby's injuries, the most compelling evidence came from Pearson himself. Pearson's inartful attempt to blame J.W. for causing the baby's injuries, the fact that he concealed his face at the urgent care facility and then left before law enforcement arrived, and his inculpatory admissions made during police interrogation, strongly inculpated him in the crime. Based on the strength of the evidence adduced at Pearson's trial, we are confident that the jury's verdict would have been the same had the challenged testimony not been admitted.

Although Pearson posits that Mariah could have been responsible for injuring G.W., the evidence showed that while she was neglectful, Mariah was not physically abusive towards G.W. Virtually nothing inculpated her in the baby's beating other than the fact that G.W. was near or around her when his skull was fractured.

58.

As the parties recognize, " '[s]urmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) We conclude that Pearson has failed to surmount that bar here.

## IV. The Jury Instruction on Flight

Pearson contends there was insufficient evidence to support the jury instruction on flight (CALCRIM No. 372). We conclude that substantial evidence supported the instruction.

### A. Background

The evidence adduced at trial showed that Pearson accompanied Mariah to urgent care when she took G.W. in for medical treatment. Pearson admitted as much when he was interrogated by Sergeant Bishop and Detective Beagley. However, while he was at the urgent care facility, Pearson had his hood drawn and he left before law enforcement arrived.

Over trial counsel's objection, the trial court granted the prosecutor's request for an instruction on flight. In closing argument, the prosecutor suggested that there was evidence Pearson fled the urgent care facility, which suggested guilt:

> "Someone in the reception area a black, male adult, tall, skinny wearing a hoodie with it pulled over his head. That is a red flag right there. Once it's determined that the police are coming and medical services are coming, I believe the testimony was that … Mariah told him. He was gone. [¶] What we know for a fact is that [Pearson] was not there when the police arrived. You should be asking yourselves why. What did he know and what is he scared of?"

The prosecutor subsequently told the jury: "You'll get a jury instruction on flight and it is my position that he knew what you know now based on the evidence what happened. When he knew it was getting serious, he booked it. Because after all, it is not his son, right?"

The jury was instructed on flight pursuant to CALCRIM No. 372:

"If the defendant fled [or tried to flee] (immediately after the crime was committed/ [or] after (he/she) was accused of committing the crime), that conduct may show that (he/she) was aware of (his/her) guilt.  If you conclude that the defendant fled [or tried to flee], it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled [or tried to flee] cannot prove guilt by itself."

**B.      Analysis**

Flight does not require a defendant to physically run from a scene, nor does it require the defendant to reach a place of safety.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)  "[A] flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' "  (*Ibid.*)

Here, the jury instruction on flight as evidence of consciousness of guilt was appropriate based upon the evidence adduced at trial.  Pearson claims that the fact that he was wearing a hoodie was, by itself, not inherently suspicious.  That may be true, but Pearson had his hoodie drawn over his head and was looking down so that his face could not be seen while he was in the lobby of the urgent care.  Consistent with the prosecutor's comments, that was suspicious.

Further, Pearson did not approach medical staff or enter the urgent care facility when G.W. was initially checked in, despite the fact that he had accompanied Mariah and G.W. to the facility.  Pearson also left before law enforcement arrived.  From this evidence, the jury could reasonably conclude that Pearson was seeking to avoid detection.

Although the jury could reach a contrary conclusion by finding that Pearson simply went home when G.W. was transported to the hospital, that does not support Pearson's assertion that the flight instruction was improper.  "Alternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, not the court, to decide."  (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477.)

60.

We conclude that Pearson's claim of instructional error is without merit. We therefore summarily reject his remaining assertions to the contrary, including his claim of prejudice.

## V.  The Recent Amendments to Section 1170, Subdivision (b) Requires Remand for Resentencing

Finally, Pearson asserts that recent changes to section 1170, subdivision (b) necessitate remand for a resentencing hearing. The Attorney General agrees, as do we.

On October 8, 2021, Senate Bill No. 567 (2021-2022 Reg. Sess.) was signed into law. The new law amended the determinate sentencing law, section 1170, subdivision (b), which delineates the trial court's authority to impose one of three statutory terms of imprisonment, by making the middle term the presumptive sentence for a term of imprisonment, unless certain circumstances apply. (See Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).)

Effective January 1, 2022, the trial court may impose an upper term sentence only where there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying all of the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or a trial court if the defendant has consented to a court trial. (§ 1170, subd. (b)(2).)

On November 18, 2020, the trial court sentenced Pearson to a prison term of 10 years, comprised of the mid-term sentence of four years on count 1, plus the *upper term* sentence of six years for the great bodily injury enhancement.

It is undisputed that the amendments to section 1170, subdivision (b) retroactively apply to Pearson's judgment of conviction, which has not yet reached finality, and that he

is entitled to a resentencing hearing. We agree and will therefore remand this matter back to the lower court for this purpose.[18]

## **DISPOSITION**

The judgment of conviction is affirmed. The sentence is vacated and the matter is remanded back to the lower court for resentencing.


    SMITH, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.

---

[18] Pearson further contends that the cumulative errors identified in his opening brief necessitate reversal of his conviction. Because we have rejected his individual claims of error, we need not address his assertion that the cumulative effective of these errors compels reversal.